**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**EVER MONTELONGO-ROSALES, et al.,**<br><br>**Defendants.** | **Case No. 2:25-cr-20032-HLT** |

## MEMORANDUM AND ORDER

Officers recovered over ten kilograms of methamphetamine from the rental vehicle Defendant Ever Montelongo-Rosales was driving after a positive alert by Police Service Dog Skeeter (K-9 Skeeter) supplied probable cause for a warrantless search. Defendant contends officers violated his Fourth Amendment rights by detaining him without reasonable suspicion and by searching his vehicle without probable cause because K-9 Skeeter was an unreliable dog. He moves to suppress the narcotics seized, his statements to police, and the evidence retrieved from his cellphone. The Court finds that reasonable suspicion supported Defendant's temporary detention and that K-9 Skeeter is a reliable dog whose positive alert provided probable cause to search the vehicle. The Court thus denies the motion.

## I. BACKGROUND[1]

### A. Morning Stop of the Mazda

KHP Trooper Devlin Davis encountered a blue Mazda traveling northbound on I-35 around 9:00 a.m. on November 7, 2024. He stopped the vehicle and approached the driver. Codefendant Jose Jimenez-Aleman was driving the Mazda and told Davis that they were traveling from Wichita to a restaurant in Kansas City, Kansas, called El Cameron. The vehicle had a younger, female passenger who did not speak much English and who seemed confused about their destination. At one point, she told Davis they were headed to Oklahoma City (rather than Kansas City). Jimenez-Aleman also told Davis that he rented the Mazda that morning and that he had to return it the next day in Wichita. Jimenez-Aleman provided the rental agreement. And he told officers about a firearm in the vehicle.

Davis was suspicious and called for KHP Lieutenant Scott Walker and K-9 Skeeter to assist.[2] K-9 Skeeter was fourteen months old and had been certified as a police service dog for about three months. Walker estimated K-9 Skeeter had about 50-60 additional hours of training since being certified in August 2024. He and Walker had certified together and had worked together since their certification. Walker did not have any concerns about K-9 Skeeter's performance since his certification, and he would have been obligated to pull K-9 Skeeter if he had had concerns.

---

[1] The Court held an evidentiary hearing on September 11, 2026. Kansas Highway Patrol (KHP) Trooper Scott Moses, DEA Special Agent Brian Miller, KHP Lieutenant Scott Walker, and KHP Trooper Aaron Schaefer testified. The Court also received an exhibit. Each witness answered the questions put to him clearly and directly and was composed throughout his testimony. The Court notes some inconsistency between Miller's testimony and the testimony given by Moses and Schaefer as it related to surveillance of the laundromat in Raytown, Missouri. The Court credits Moses's and Schaefer's account over Miller's. To be clear, the Court does not find that Miller is not credible but instead finds that the recollections of Moses and Walker are more consistent with the overall record on this limited issue.

[2] Walker has been a KHP trooper since 2003 and a canine handler since 2009. Walker has been a certified trainer for explosives and narcotics dogs since 2013. Walker also works as a judge in connection with the canine certification process. Walker has trained well over a hundred dogs from "start to finish" and has certified hundreds.

They arrived on the scene, and Walker deployed K-9 Skeeter. K-9 Skeeter did a sniff of the vehicle's exterior. He started at the vehicle's rear and moved along a counterclockwise path. K-9 Skeeter alerted and then indicated that the smell was strongest around the Mazda's front passenger-side door.[3] Davis and Walker searched the Mazda. Walker observed that the vehicle's passenger area appeared to have been manipulated in a fashion consistent with efforts to conceal contraband. But they did not locate any narcotics, only the firearm. Davis then released Jimenez-Aleman and the female passenger.

### B. Surveillance Team and Intelligence Gathering

Davis contacted KHP Trooper Scott Moses during his encounter with Jimenez-Aleman and asked Moses to investigate the Mazda's occupants. Moses works with KHP's drug enforcement task force and has been with KHP since 2015 (before that he worked six years in military intelligence with the United States Army). Moses agreed and learned that a DEA task force in Kansas City was investigating El Cameron (Jimenez-Aleman's stated destination) for drug trafficking and money laundering. Moses learned that there were cocaine purchases coming from that restaurant and money was being laundered back to Mexico. Moses also learned that Jimenez-Aleman had been selling large quantities of methamphetamine to DEA agents out of a restaurant in Wichita. Moses then contacted the DEA agents in charge of those investigations to get clarification and to confirm that their enforcement would not impede those investigations. Moses relayed the information he learned to Davis and Walker, but they had already released Jimenez-Aleman and the female passenger.

---

[3] Walker explained that an "alert" is when a police service dog has detected one of the odors it's trained to detect but has not yet located where the odor is strongest. He further explained that an "indication" occurs when the police service dog determines where the odor is strongest.

Moses decided to assemble a team to surveil the Mazda. He asked DEA Special Agent Brian Miller (who had been an agent for six years) to coordinate a surveillance team while Moses continued to gather intelligence. The surveillance team included DEA agents and Kansas City, Kansas task force officers (TFOs). Through his continued intelligence gathering, Moses learned that Jimenez-Aleman was receiving large quantities of methamphetamine from Mexico, and it was typically coming up through Oklahoma City or Kansas City and then being resourced back down to Wichita. He shared this information with (at least) Davis, Walker, Miller, and his supervisor.

The surveillance team got put in place. Moses was not physically part of the surveillance team, but he was in constant communication with the surveillance team through his DEA radio and KHP radio. He got information from both radios and could broadcast information between the two groups through the radios. Throughout the operation, Moses conveyed multiple items of interest over the radios between DEA and KHP. And he received confirmation that this information was heard or received as troopers, agents, and TFOs responded.

**C. El Cameron**

The surveillance team saw Jimenez-Aleman and the female passenger enter El Cameron. At some point a white Meyer Construction work truck arrived and parked next to the Mazda. A Hispanic male (later identified as Defendant) exited the truck and entered the restaurant. Defendant, Jimenez-Aleman, and the female passenger remained in El Cameron for a brief time (about 12 minutes) and exited together. Defendant left in the truck, and Jimenez-Aleman and the female passenger left in the Mazda.

**D. Laundromat**

The surveillance teams followed the vehicles after they left El Cameron. Both vehicles went to a laundromat in a strip mall in Raytown, Missouri. The vehicles parked next to each other.

The surveillance team had some difficulty observing the lot, but the female passenger exited the Mazda, entered the laundromat empty-handed, stayed briefly, and left the laundromat empty-handed.

### E. Candlewood Suites

The surveillance team followed the vehicles after they left the laundromat. Both vehicles went to the Candlewood Suites in Olathe, Kansas. Once the vehicles arrived at the hotel, the surveillance team observed that the drivers of the vehicles had changed (i.e., flip-flopped), which must have occurred at the laundromat.[4] Defendant was driving the Mazda even though he was not listed on the rental agreement, and Jimenez-Aleman and the female passenger were in the truck. The vehicles again parked in adjacent parking spots, but they faced opposite directions (i.e., one pulled straight into the spot and the other reversed into the spot). Both drivers then opened their doors, which blocked the field of vision. Moses explained that this tactic is an effort to conceal the movement of items between vehicles by blocking the view. But the surveillance team still observed movement between the vehicles and an exchange of a bag from the truck to the rear passenger seat of the Mazda. The vehicles left the hotel (the truck first and then the Mazda) and drove southbound on I-35.

### F. Coordinated Stop of the Truck and the Mazda

Moses had continued to transmit information learned from the surveillance team over the KHP and DEA radios. He made the decision to execute a coordinated stop on the truck and Mazda after the vehicles left the hotel.

Davis and Walker (the same troopers who conducted the morning stop on Jimenez-Aleman in the Mazda) executed the vehicle stop on Jimenez-Aleman in the truck. The female passenger

---

[4] Miller testified that he observed Jimenez-Aleman and the female passenger leave the laundromat in the truck and Defendant leave the laundromat in the Mazda.

was still with him. Davis stopped the truck in Franklin County, Kansas, around 3:10 p.m. Moses intentionally wanted the same troopers to execute this stop so they could assess Jimenez-Aleman's reaction and his explanation about the rental vehicle. Jimenez-Aleman told them that he worked for Meyer Construction and that the company asked him to return the rental vehicle and drive the truck to Wichita. Davis and Walker (as well as Moses and others involved in the operation) knew this was a lie because Defendant was in the Mazda a few miles away parked at a gas station. Walker deployed K-9 Skeeter, who again worked counterclockwise from the back of the vehicle. Skeeter indicated and alerted at the driver's side rear door of the truck's crew cab. Walker and Davis searched the truck but did not locate any narcotics (just the firearm Jimenez-Aleman had also had with him in the Mazda).

Meanwhile, KHP Trooper Aaron Miller[5] and KHP Trooper Aaron Schaefer contacted Defendant in the Mazda, which was parked at a gas station a few miles away from the truck. Moses instructed Schaefer to make contact with Defendant. But Schaefer had also been following the surveillance efforts throughout the afternoon. Schaefer knew that: (1) the Mazda had been stopped earlier that morning and that Jimenez-Aleman had been the driver and there was also a female passenger, (2) the Mazda had been subjected to a dog sniff but no drugs had been found despite a positive alert, (3) Jimenez-Aleman had said he was headed to a restaurant in Kansas City, (4) the restaurant to which Jimenez-Aleman was headed was the subject of a drug trafficking investigation by DEA, (5) Jimenez-Aleman was a "known distributor" of narcotics in the Wichita area, (6) Jimenez-Aleman in the Mazda and another man in a truck arrived at the restaurant and stayed for a brief time, (7) both vehicles traveled from the restaurant in Kansas City, Kansas, to a laundromat

---

[5] This case involves DEA SA Brian Miller and KHP Trooper Aaron Miller. The Court refers to DEA SA Brian Miller as "Miller" and KHP Trooper Aaron Miller as "Aaron" to avoid confusion. Schaefer has been with KHP since 2019.

in Raytown, Missouri, and Jimenez-Aleman's female passenger went into the laundromat for a few minutes, (8) both vehicles left the laundromat and went to a hotel in Olathe, Kansas, (9) a bag was transferred by Jimenez-Aleman from the truck to the Mazda at the hotel, (10) both vehicles left the hotel, and (11) Jimenez-Aleman and his female passenger were now traveling in the truck and were no longer in the Mazda.

Schaefer made contact with Defendant at about 3:11 p.m. The Mazda was parked at the gas station. Schaefer asked Defendant to step out of the Mazda to talk. Defendant told Schaefer and Aaron that he was driving a rental vehicle that he had rented in Wichita. He initially claimed that he had rented the vehicle the week before, but he then changed his response and claimed to have rented it the day before. Defendant claimed he had been working in Olathe for the past week and that he was on his way home to Wichita because he had the next week off. Aaron asked Defendant for the rental agreement, which Defendant produced. Defendant was not a listed driver on the agreement. Aaron asked Defendant if he could search the vehicle; Defendant declined. Schaefer then asked Walker to bring K-9 Skeeter to sniff the vehicle. Schaefer then radioed for Defendant's criminal history and tried to determine what to do with the vehicle because Defendant was not a listed driver.

Walker arrived at the gas station around 3:29 p.m., while Schaefer was still waiting for Defendant's criminal history. Walker spoke briefly with Aaron and Schaefer and noted that the Mazda appeared to be the same vehicle he had encountered that morning. Walker also noted the apparent discrepancies between Jimenez-Aleman's story about returning the vehicle and Defendant's story (relayed to him by Aaron and Schaefer) that Defendant had rented the vehicle. Walker deployed K-9 Skeeter on the front passenger side of the vehicle. K-9 Skeeter worked counterclockwise, indicated, and sat down by the taillight on the Mazda's driver's side. The

ensuing search recovered a duffel bag near the rear driver's side door that contained over 10 kilograms of methamphetamine.

## II. ANALYSIS

The Fourth Amendment secures the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Defendant contends Aaron and Schaefer violated his Fourth Amendment rights by temporarily detaining him at the gas station without reasonable suspicion, continuing to detain him until K-9 Skeeter arrived without reasonable suspicion, and searching the Mazda based on K-9 Skeeter's indication because he was an unreliable dog whose indication could not give probable cause. The Court disagrees on all points.

### A. Reasonable Suspicion Justified Defendant's Initial Detention

Defendant initially argues that Aaron and Schaefer violated his Fourth Amendment rights by unlawfully detaining him at the gas station. A temporary non-consensual investigatory detention, such as a vehicle stop, is a seizure under the Fourth Amendment. *United States v. Windom*, 863 F.3d 1322, 1327 (10th Cir. 2017). But it need only be supported by reasonable suspicion that criminal activity is occurring. *Id.* An investigatory detention must be "justified at [its] inception" and must be "reasonably related in scope to the circumstances which justified" it in the first place. *Id.* at 1328 (internal quotation and citation omitted). This means it must be supported by reasonable suspicion at the outset. *United States v. Campbell*, 156 F.4th 1019, 1024 (10th Cir. 2025). And it must be "temporary and last no longer than is necessary to effectuate the purpose of either dispelling or confirming" that suspicion. *Id.* (internal quotation and citation omitted). "Once reasonable suspicion is dispelled, even a very brief extension of the detention [or stop] without consent or reasonable suspicion violates the Fourth Amendment." *Id.* (internal quotation and citation omitted).

Reasonable suspicion is evaluated objectively. *United States v. Wallace*, 429 F.3d 969, 975 (10th Cir. 2005). And it is evaluated against the totality of the circumstances and "in light of common sense and ordinary human experience" with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances. *Id.* at 975-76 (internal quotation and citations omitted). Reasonable suspicion requires merely that a law enforcement officer have a "particularized and objective basis for suspecting an individual may be involved in criminal activity." *Campbell*, 165 F.4th at 1024 (internal quotation and citation omitted).

Importantly, the information that gives an officer reasonable suspicion to temporarily detain someone for investigatory purposes need not have been gleaned by the officer firsthand. Rather, it can be the product of information communicated to the officer in the field by other officers. Officers are entitled to rely within the bounds of reason on the information passed to them by other officers in the field. *See United States v. Chavez*, 534 F.3d 1338, 1345-46 (10th Cir. 2008) (describing the "horizontal" collective knowledge doctrine). Further, the officer executing the investigatory stop need not have an independent basis for reasonable suspicion if acting at the behest or instruction of another officer who does. *Id.* (discussing the "vertical" collective knowledge doctrine).

In this case, Moses decided to conduct the coordinated vehicle stop. He instructed Schaefer and Aaron to detain Defendant in the gas station parking lot for the purpose of investigating possible drug trafficking. It's sufficient for Fourth Amendment purposes that Moses had reasonable suspicion to support his instruction. And it's clear to the Court that he had reasonable suspicion based on the totality of the circumstances.

Moses had been involved throughout the day in investigating the Mazda, the truck, Jimenez-Aleman, the female passenger, and Defendant. Davis contacted Moses earlier that day after stopping Jimenez-Aleman while Jimenez-Aleman was driving the Mazda to Kansas City. Moses knew that Jimenez-Aleman rented the Mazda that morning. He knew that K-9 Skeeter had positively indicated that he detected the odor of narcotics in the vehicle but that Davis and Walker did not recover narcotics. Moses learned that Jimenez-Aleman had been selling methamphetamine to the DEA in Wichita from a restaurant, and he learned that the DEA was investigating El Cameron for its possible connections to drug trafficking and money laundering. Moses knew that Jimenez-Aleman met Defendant at El Cameron but did not stay long at the restaurant, that they traveled in separate vehicles across the state line to a laundromat in Raytown, Missouri, wherein the female passenger entered the laundromat emptyhanded and left a few minutes later still emptyhanded, and that Jimenez-Aleman and Defendant recrossed the state line to go to a hotel in Olathe, Kansas. He also knew that Jimenez-Aleman and Defendant had swapped vehicles, that they tried to conceal the transfer of a duffle bag from the truck to the Mazda, and that Defendant left the hotel driving the Mazda even though his name was not on the rental agreement.

The totality of this information—the unusual travel throughout the Kansas City area involving a rental car and another vehicle, the swapping of the vehicles, the transfer of a bag in a furtive manner, the earlier indication that the odor of narcotics was present in the Mazda, Jimenez-Aleman's known connection to drug trafficking in Wichita, and the suspected connection between El Cameron and drug trafficking and money laundering—reasonably afforded Moses an articulable belief that illegal drug activities had occurred or were occurring and that the Mazda and Defendant were involved.

To be sure, it is possible an innocent explanation for the truck's and the Mazda's trip to the laundromat exists. Likewise, it might have been an innocent coincidence that the restaurant Jimenez-Aleman and Defendant met at was being investigated for its connections to drug trafficking. And there's certainly nothing criminal about placing a bag in the backseat of a vehicle in a hotel parking lot or about two drivers swapping vehicles. But an objectively reasonable, articulable belief that the Mazda and Defendant were involved in some sort of illegal activity easily emerges when these facts are taken in context and viewed together in combination with other facts (e.g., Jimenez-Aleman's known connection to drug trafficking) and viewed through the perspectives of common sense and ordinary human experience with deference to a trained law enforcement officer's abilities to separate the innocent from the suspicious. And it's from this perspective and against this "totality of circumstances" that the existence of reasonable suspicion is properly measured. *Wallace*, 429 F.3d at 975-76. Reasonable suspicion does not demand that law enforcement officers "rule out the possibility of innocent conduct." *Campbell*, 156 F.4th at 1024.

Defendant points to the earlier search that did not reveal narcotics as undercutting reasonable suspicion. But that search occurred hours earlier and ignores all the other information learned throughout the day. It was reasonable for Moses to believe that contraband might be present in the Mazda after all of that had occurred (especially the furtive transfer of the duffle bag) even though it had not been present earlier.

It is sufficient that all this was known to Moses because he made the decision and instructed Schaefer and Aaron to detain Defendant. But, even if Schaefer and Aaron themselves needed reasonable suspicion as the officers detaining Defendant, they had it. Schaefer testified that he knew virtually all the above facts when he contacted Defendant. He knew about the connections

to drug trafficking, about the earlier detection of the odor of narcotics in the Mazda, about the movements of the vehicles throughout the day, and about the furtive placement of the duffle bag in the Mazda at the hotel parking lot in Olathe. For both these reasons, Defendant's detention was supported by reasonable suspicion at its outset.

### B. Reasonable Suspicion Justified Defendant's Continued Detention

Defendant next contends that Schaefer and Aaron lacked reasonable suspicion to continue his detention until K-9 Skeeter arrived. This is wrong. His continued detention was reasonably related in scope to the circumstances that prompted Defendant's initial detention. And Schaefer and Aaron's contact with Defendant revealed additional circumstances suggestive of Defendant's connection to drug trafficking, which served as the basis for his initial detention. Defendant's fabricated story about how he came to be driving the Mazda is a prime example. Schaefer knew that the Mazda had been stopped earlier and that Jimenez-Aleman had rented it. He confirmed this knowledge by reviewing the rental agreement (that Defendant produced), which reflected that Jimenez-Aleman was the renter and that Defendant was not a listed driver. Schaefer thus knew that Defendant's story about renting the vehicle was false. These sorts of contradictory or false statements can contribute to a reasonable suspicion of criminal activity. *See Wallace*, 429 F.3d at 976 (noting that "inconsistencies in information provided . . . during the traffic stop may give rise to reasonable suspicion" (internal quotation marks omitted)).

Given the basis for the initial stop and given the false story Defendant gave about renting the vehicle, it was reasonable for Schaefer and Aaron to continue to detain Defendant while they waited briefly for Walker to arrive and deploy K-9 Skeeter for a canine sniff, determined what to do with the vehicle given that Defendant was not a listed driver, and waited for a return on his criminal history. Nothing that occurred between their initial approach and K-9 Skeeter's arrival

dissipated the original reasonable suspicion. *See United States v. Labs*, 2026 WL 555549, at *9 (10th Cir. 2026) (observing that the continued detention of a motorist while waiting for a dog sniff did not offend the Fourth Amendment where suspicion of drug trafficking already existed and did not dissipate before the dog arrived).

**C. Probable Cause Justified the Vehicle Search**

The Fourth Amendment also guards against unreasonable law enforcement searches of property. Searches that are conducted without warrants are presumptively unreasonable. But there is a "plethora" of exceptions to this general rule. *United States v. Najar*, 451 F.3d 710, 713 n.1 (10th Cir. 2006) (discussing Justice Thomas's dissent in *Groh v. Ramirez*, 540 U.S. 551 (2004)). One of these is the so-called automobile exception, which blesses warrantless automobile searches if supported by probable cause. *Chavez*, 534 F.3d at 1345.

Probable cause is measured against an objective standard and exists "where the known facts and circumstances [ ] warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). It requires "a fair probability that contraband or evidence of a crime will be found" in the place to be searched. *United States v. Kitchell*, 653 F.3d 1206, 1223 (10th Cir. 2011) (internal quotation and citation omitted). And, in the context of a vehicle stop, a dog sniff during which the odor of narcotics is detected can give rise to probable cause to conduct a search. *E.g., id.* ("This Court has repeatedly recognized that a reliable narcotics-detection dog's alert to a vehicle suffices to establish this 'fair probability.'"). Probable cause to search is a "fluid concept" and is not "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). It "turn[s] on the assessment of probabilities in particular factual contexts." *Id.*

Defendant acknowledges that a canine sniff that indicates the presence of contraband in a vehicle can give officers probable cause to search. But he highlights the requirement that the dog doing the sniff be "reliable." The Tenth Circuit has "commented that a dog alert might not give probable cause if the particular dog had a poor accuracy record." *United States v. Bertram*, 307 F. App'x 214, 215 (10th Cir. 2009) (quoting *United States v. Kennedy*, 131 F.3d 1371, 1377 (10th Cir. 1997) (internal quotation and alterations omitted)). Defendant thus argues that K-9 Skeeter was not sufficiently reliable to give Schaefer, Aaron, and Walker probable cause to search the Mazda because K-9 Skeeter's indication had been the basis of two earlier vehicle searches that did not yield narcotics. In Defendant's view, this performance record means that K-9 Skeeter had erroneously detected the odor of narcotics twice that day, which calls into doubt his reliability. Defendant concludes that the vehicle search therefore was not supported by probable cause and violated his Fourth Amendment rights.

The Court disagrees for at least two reasons. First, the "reliability of [a] drug canine's alert" is "established by presenting evidence regarding the canine's training and certification," in addition to other evidence of reliability that might be available. *Id.* (citing *United States v. Clarkson*, 551 F.3d 1196, 1204-05 (10th Cir. 2009)). K-9 Skeeter was a trained and certified police service dog. K-9 Skeeter trained and certified with Walker a few months earlier and, in the intervening months, continued to receive training. Walker is a trainer and a judge for certification purposes. He observed K-9 Skeeter in the field and did not have any concerns about K-9 Skeeter's ability to accurately and reliably detect the odor of narcotics.

Second, police service dogs like K-9 Skeeter are trained to detect the <u>odor</u> of narcotics. They alert and indicate an odor. It does not follow that simply because tangible quantities of narcotics are not recovered that there was something unreliable about the dog's alert or indication.

*See Florida v. Harris*, 568 U.S. 237, 245-46 (2013) ("[I]f a [police] dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all" because "the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person."). K-9 Skeeter's multiple alerts and indications throughout the day may not have been "false positives." Indeed, at least insofar as the truck is concerned, there's evidence in the record that the duffle bag with the narcotics had recently been in it. In the Court's view, Schaefer, Aaron, and Walker were justified in viewing K-9 Skeeter as reliable. And K-9 Skeeter's alert and indication gave them probable cause to search the vehicle.

## III. CONCLUSION

The Court denies Defendant's motion to suppress. Reasonable suspicion supported his initial temporary detention. This suspicion did not dissipate while KHP personnel waited for a dog sniff of the vehicle Defendant was driving. And the police service dog's positive alert and indication that the odor of narcotics had been detected in the vehicle provided probable cause to conduct a warrantless search under the automobile exception. Defendant's Fourth Amendment rights were not violated.

THE COURT THEREFORE ORDERS that Defendant's motion to suppress (Doc. 49) is DENIED.

IT IS SO ORDERED.

Dated: October 26, 2026

/s/ Holly L. Teeter

HOLLY L. TEETER
UNITED STATES DISTRICT JUDGE